# EXHIBIT 1

# EXHIBIT 1

# EXHIBIT 1

# EXHIBIT 1

# Rules and Regulations

Federal Register

Vol. 85, No. 73

Wednesday, April 15, 2020

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 120

[Docket No. SBA-2020-0015]

RIN 3245-AH34

### Business Loan Program Temporary Changes; Paycheck Protection Program

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** This interim final rule announces the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new product, titled the "Paycheck Protection Program," to the U.S. Small Business Administration's (SBA's) 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. The Paycheck Protection Program and loan forgiveness are intended to provide economic relief to small businesses nationwide adversely impacted under the Coronavirus Disease 2019 (COVID-19) Emergency Declaration (COVID-19 Emergency Declaration) issued by President Trump on March 13, 2020. This interim final rule outlines the key provisions of SBA's implementation of sections 1102 and 1106 of the Act in formal guidance and requests public comment.

**DATES:**

*Effective date:* This interim final rule is effective April 15, 2020.

*Applicability date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.

*Comment Date:* Comments must be received on or before May 15, 2020.

**ADDRESSES:** You may submit comments, identified by number SBA-2020-0015 through the Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

SBA will post all comments on *www.regulations.gov.* If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov.* Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** Call Center Representative at 833-572-0502, or the local SBA Field Office; the list of offices can be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019 (COVID-19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, territories, and the District of Columbia. With the COVID-19 emergency, many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus. These measures, some of which are government-mandated, are being implemented nationwide and include the closures of restaurants, bars, and gyms. In addition, based on the advice of public health officials, other measures, such as keeping a safe distance from others or even stay-at-home orders, are being implemented, resulting in a dramatic decrease in economic activity as the public avoids malls, retail stores, and other businesses.

On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act or the Act) (Pub. L. 116-136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The Small Business Administration (SBA) received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program." Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. A more detailed discussion of sections 1102 and 1106 of the Act is found in section III below.

### II. Comments and Immediate Effective Date

The intent of the Act is that SBA provide relief to America's small businesses expeditiously. This intent, along with the dramatic decrease in economic activity nationwide, provides good cause for SBA to dispense with the 30-day delayed effective date provided in the Administrative Procedure Act. Specifically, small businesses need to be informed on how to apply for a loan and the terms of the loan under section 1102 of the Act as soon as possible because the last day to apply for and receive a loan is June 30, 2020. The immediate effective date of this interim final rule will benefit small businesses so that they can immediately apply for the loan with a full understanding of loan terms and conditions. This interim final rule is effective without advance notice and public comment because section 1114 of the Act authorizes SBA to issue regulations to implement Title 1 of the Act without regard to notice requirements. This rule is being issued to allow for immediate implementation of this program. Although this interim final rule is effective immediately, comments are solicited from interested members of the public on all aspects of the interim final rule, including section III below. These comments must be submitted on or before May 15, 2020. The SBA will consider these comments and the need for making any revisions as a result of these comments.

### III. Temporary New Business Loan Program: Paycheck Protection Program

*Overview*

The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses

affected by the COVID-19 emergency. Among the provisions contained in the CARES Act are provisions authorizing SBA to temporarily guarantee loans under a new 7(a) loan program titled the "Paycheck Protection Program." Loans guaranteed under the Paycheck Protection Program (PPP) will be 100 percent guaranteed by SBA, and the full principal amount of the loans may qualify for loan forgiveness. The following outlines the key provisions of the PPP.

1. General

SBA is authorized to guarantee loans under the PPP through June 30, 2020. Congress authorized a program level of $349,000,000,000 to provide guaranteed loans under this new 7(a) program. The intent of the Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program. For example, for loans made under the PPP, SBA will not require the lenders to comply with section 120.150 "What are SBA's lending criteria?." SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness. Lenders must comply with the applicable lender obligations set forth in this interim final rule, but will be held harmless for borrowers' failure to comply with program criteria; remedies for borrower violations or fraud are separately addressed in this interim final rule. The program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement (as defined in 13 CFR 120.10).

2. What do borrowers need to know and do?

a. Am I eligible?

You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry, and:
i. You are:
A. A small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), and subject to SBA's affiliation rules under 13 CFR 121.301(f) unless specifically waived in the Act; or
B. A tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, or any other business; and
ii. You were in operation on February 15, 2020 and either had employees for whom you paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC.

You are also eligible for a PPP loan if you are an individual who operates under a sole proprietorship or as an independent contractor or eligible self-employed individual, and you were in operation on February 15, 2020.

You must also submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099-MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

SBA intends to promptly issue additional guidance with regard to the applicability of affiliation rules at 13 CFR 121.103 and 121.301 to PPP loans.

b. Could I be ineligible even if I meet the eligibility requirements in (a) above?

You are ineligible for a PPP loan if, for example:
i. You are engaged in any activity that is illegal under Federal, state, or local law;
ii. You are a household employer (individuals who employ household employees such as nannies or housekeepers);
iii. An owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony within the last five years; or
iv. You, or any business owned or controlled by you or any of your owners, has ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted within the last seven years and caused a loss to the government.

The Administrator, in consultation with the Secretary of the Treasury (the Secretary), determined that household employers are ineligible because they are not businesses. 13 CFR 120.100.

c. How do I determine if I am ineligible?

Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible. (SOP 50 10 can be found at *https://www.sba.gov/document/sop-50-10-5-lender-development-company-loan-programs.*)

d. I have determined that I am eligible. How much can I borrow?

Under the PPP, the maximum loan amount is the lesser of $10 million or an amount that you will calculate using a payroll-based formula specified in the Act, as explained below.

e. How do I calculate the maximum amount I can borrow?

The following methodology, which is one of the methodologies contained in the Act, will be most useful for many applicants.
i. Step 1: Aggregate payroll costs (defined in detail below in f.) from the last twelve months for employees whose principal place of residence is the United States.
ii. Step 2: Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year.
iii. Step 3: Calculate average monthly payroll costs (divide the amount from Step 2 by 12).
iv. Step 4: Multiply the average monthly payroll costs from Step 3 by 2.5.
v. Step 5: Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID-19 loan (because it does not have to be repaid).

The examples below illustrate this methodology.
i. Example 1—No employees make more than $100,000
  Annual payroll: $120,000
  Average monthly payroll: $10,000
  Multiply by 2.5 = $25,000
  Maximum loan amount is $25,000
ii. Example 2—Some employees make more than $100,000
  Annual payroll: $1,500,000
  Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
  Average monthly qualifying payroll: $100,000
  Multiply by 2.5 = $250,000
  Maximim loan amount is $250,000

iii. Example 3—No employees make more than $100,000, outstanding EIDL loan of $10,000.
Annual payroll: $120,000
Average monthly payroll: $10,000
Multiply by 2.5 = $25,000
Add EIDL loan of $10,000 = $35,000
Maximum loan amount is $35,000

iv. Example 4—Some employees make more than $100,000, outstanding EIDL loan of $10,000
Annual payroll: $1,500,000
Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
Average monthly qualifying payroll: $100,000
Multiply by 2.5 = $250,000
Add EIDL loan of $10,000 = $260,000
Maximum loan amount is $260,000

f. What qualifies as "payroll costs?"

Payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation.

g. Is there anything that is expressly excluded from the definition of payroll costs?

Yes. The Act expressly excludes the following:
i. Any compensation of an employee whose principal place of residence is outside of the United States;
ii. The compensation of an individual employee in excess of an annual salary of $100,000, prorated as necessary;
iii. Federal employment taxes imposed or withheld between February 15, 2020 and June 30, 2020, including the employee's and employer's share of FICA (Federal Insurance Contributions Act) and Railroad Retirement Act taxes, and income taxes required to be withheld from employees; and
iv. Qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Pub. L. 116–127).

h. Do independent contractors count as employees for purposes of PPP loan calculations?

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan calculation.

i. What is the interest rate on a PPP loan?

The interest rate will be 100 basis points or one percent.
The Administrator, in consultation with the Secretary, determined that a one percent interest rate is appropriate. First, it provides low cost funds to borrowers to meet eligible payroll costs and other eligible expenses during this temporary period of economic dislocation caused by the coronavirus. Second, for lenders, the 100 basis points offers an attractive interest rate relative to the cost of funding for comparable maturities. For example, the FDIC's weekly national average rate for a 24-month CD deposit product for the week of March 30, 2020 is 42 basis points for non-jumbo and 44 basis points for jumbo (https://www.fdic.gov/regulations/resources/rates/). Third, the interest rate is higher than the yield on Treasury securities of comparable maturity. For example, the yield on the Treasury two-year note is approximately 23 basis points. This higher yield combined with the fact that the loans are 100 percent guaranteed by the SBA and the fact that lenders will receive a substantial processing fee from the SBA provide ample inducement for lenders to participate in the PPP.

j. What will be the maturity date on a PPP loan?

The maturity is two years. While the Act provides that a loan will have a maximum maturity of up to ten years from the date the borrower applies for loan forgiveness (described below), the Administrator, in consultation with the Secretary, determined that a two year loan term is sufficient in light of the temporary economic dislocations caused by the coronavirus. Specifically, the considerable economic disruption caused by the coronavirus is expected to abate well before the two year maturity date such that borrowers will be able to re-commence business operations and pay off any outstanding balances on their PPP loans.

k. Can I apply for more than one PPP loan?

No. The Administrator, in consultation with the Secretary, determined that no eligible borrower may receive more than one PPP loan. This means that if you apply for a PPP loan you should consider applying for the maximum amount. While the Act does not expressly provide that each eligible borrower may only receive one PPP loan, the Administrator has determined, in consultation with the Secretary, that because all PPP loans must be made on or before June 30, 2020, a one loan per borrower limitation is necessary to help ensure that as many eligible borrowers as possible may obtain a PPP loan. This limitation will also help advance Congress' goal of keeping workers paid and employed across the United States.

l. Can I use e-signatures or e-consents if a borrower has multiple owners?

Yes, e-signature or e-consents can be used regardless of the number of owners.

m. Is the PPP "first-come, first-served?"

Yes.

n. When will I have to begin paying principal and interest on my PPP loan?

You will not have to make any payments for six months following the date of disbursement of the loan. However, interest will continue to accrue on PPP loans during this six-month deferment. The Act authorizes the Administrator to defer loan payments for up to one year. The Administrator determined, in consultation with the Secretary, that a six-month deferment period is appropriate in light of the modest interest rate (one percent) on PPP loans and the loan forgiveness provisions contained in the Act.

o. Can my PPP loan be forgiven in whole or in part?

Yes. The amount of loan forgiveness can be up to the full principal amount of the loan and any accrued interest. That is, the borrower will not be responsible for any loan payment if the borrower uses all of the loan proceeds for forgiveable purposes described below and employee and compensation levels are maintained. The actual amount of loan forgiveness will depend, in part, on the total amount of payroll costs, payments of interest on mortgage obligations incurred before February 15, 2020, rent payments on leases dated before February 15, 2020, and utility payments under service agreements dated before February 15, 2020, over the eight-week period following the date of the loan. However, not more than 25 percent of the loan forgiveness amount may be attributable to non-payroll costs. While the Act provides that borrowers are eligible for forgiveness in an amount equal to the sum of payroll costs and

any payments of mortgage interest, rent, and utilities, the Administrator has determined that the non-payroll portion of the forgivable loan amount should be limited to effectuate the core purpose of the statute and ensure finite program resources are devoted primarily to payroll. The Administrator has determined in consultation with the Secretary that 75 percent is an appropriate percentage in light of the Act's overarching focus on keeping workers paid and employed. Further, the Administrator and the Secretary believe that applying this threshold to loan forgiveness is consistent with the structure of the Act, which provides a loan amount 75 percent of which is equivalent to eight weeks of payroll (8 weeks/2.5 months = 56 days/76 days = 74 percent rounded up to 75 percent). Limiting non-payroll costs to 25 percent of the forgiveness amount will align these elements of the program, and will also help to ensure that the finite appropriations available for PPP loan forgiveness are directed toward payroll protection. SBA will issue additional guidance on loan forgiveness.

p. Do independent contractors count as employees for purposes of PPP loan forgiveness?

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan forgiveness.

q. What forms do I need and how do I submit an application?

The applicant must submit SBA Form 2483 (Paycheck Protection Program Application Form) and payroll documentation, as described above. The lender must submit SBA Form 2484 (Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty) electronically in accordance with program requirements and maintain the forms and supporting documentation in its files.

r. How can PPP loans be used?

The proceeds of a PPP loan are to be used for:
 i. payroll costs (as defined in the Act and in 2.f.);
 ii. costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
 iii. mortgage interest payments (but not mortgage prepayments or principal payments);
 iv. rent payments;
 v. utility payments;
 vi. interest payments on any other debt obligations that were incurred before February 15, 2020; and/or

 vii. refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. Proceeds from any advance up to $10,000 on the EIDL loan will be deducted from the loan forgiveness amount on the PPP loan.

However, at least 75 percent of the PPP loan proceeds shall be used for payroll costs. For purposes of determining the percentage of use of proceeds for payroll costs, the amount of any EIDL refinanced will be included. For purposes of loan forgiveness, however, the borrower will have to document the proceeds used for payroll costs in order to determine the amount of forgiveness. While the Act provides that PPP loan proceeds may be used for the purposes listed above and for other allowable uses described in section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the Administrator believes that finite appropriations and the structure of the Act warrant a requirement that borrowers use a substantial portion of the loan proceeds for payroll costs, consistent with Congress' overarching goal of keeping workers paid and employed. As with the similar limitation on the forgiveness amount explained earlier, the Administrator, in consultation with the Secretary, has determined that 75 percent is an appropriate percentage that will align this element of the program with the loan amount, 75 percent of which is equivalent to eight weeks of payroll. This limitation on use of the loan funds will help to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven.

s. What happens if PPP loan funds are misused?

If you use PPP funds for unauthorized purposes, SBA will direct you to repay those amounts. If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud. If one of your shareholders, members, or partners uses PPP funds for unauthorized purposes, SBA will have recourse against the shareholder, member, or partner for the unauthorized use.

t. What certifications need to be made?

On the Paycheck Protection Program application, an authorized representative of the applicant must certify in good faith to all of the below:[1]

 i. The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.
 ii. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant.
 iii. The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments; I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud. As explained above, not more than 25 percent of loan proceeds may be used for non-payroll costs.
 iv. Documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight week period following this loan will be provided to the lender.
 v. Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities. As explained above, not more than 25 percent of the forgiven amount may be for non-payroll costs.
 vi. During the period beginning on February 15, 2020 and ending on December 31, 2020, the applicant has not and will not receive another loan under this program.
 vii. I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

---

[1] A representative of the applicant can certify for the business as a whole if the representative is legally authorized to do so.

viii. I acknowledge that the lender will confirm the eligible loan amount using tax documents I have submitted. I affirm that these tax documents are identical to those submitted to the Internal Revenue Service. I also understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

3. What do lenders need to know and do?

a. Who is eligible to make PPP loans?

i. All SBA 7(a) lenders are automatically approved to make PPP loans on a delegated basis.

ii. The Act provides that the authority to make PPP loans can be extended to additional lenders determined by the Administrator and the Secretary to have the necessary qualifications to process, close, disburse, and service loans made with the SBA guarantee. Since SBA is authorized to make PPP loans up to $349 billion by June 30, 2020, the Adminstrator and the Secretary have jointly determined that authorizing additional lenders is necessary to achieve the purpose of allowing as many eligible borrowers as possible to receive loans by the June 30, 2020 deadline.

iii. The following types of lenders have been determined to meet the criteria and are eligible to make PPP loans unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action with their primary Federal regulator that addresses unsafe or unsound lending practices:

I. Any federally insured depository institution or any federally insured credit union;

II. Any Farm Credit System institution (other than the Federal Agricultural Mortgage Corporation) as defined in 12 U.S.C. 2002(a) that applies the requirements under the Bank Secrecy Act and its implementing regulations (collectively, BSA) as a federally regulated financial institution, or functionally equivalent requirements that are not altered by this rule; and

III. Any depository or non-depository financing provider that originates, maintains, and services business loans or other commercial financial receivables and participation interests; has a formalized compliance program; applies the requirements under the BSA as a federally regulated financial institution, or the BSA requirements of an equivalent federally regulated financial institution; has been operating since at least February 15, 2019, and has originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12 month period in the past 36 months, or is a service provider to any insured depository institution that has a contract to support such institution's lending activities in accordance with 12 U.S.C. 1867(c) and is in good standing with the appropriate Federal banking agency.

iv. Qualified institutions described in 3.a.iii.I. and II. will be automatically qualified under delegated authority by the SBA upon transmission of CARES Act Section 1102 Lender Agreement (SBA Form 3506) unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action by their primary Federal regulator that addresses unsafe or unsound lending practices.

b. What do lenders have to do in terms of loan underwriting?

Each lender shall:

i. Confirm receipt of borrower certifications contained in Paycheck Protection Program Application form issued by the Administration;

ii. Confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020;

iii. Confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application; and

iv. Follow applicable BSA requirements:

I. Federally insured depository institutions and federally insured credit unions should continue to follow their existing BSA protocols when making PPP loans to either new or existing customers who are eligible borrowers under the PPP. PPP loans for existing customers will not require re-verification under applicable BSA requirements, unless otherwise indicated by the institution's risk-based approach to BSA compliance.

II. Entities that are not presently subject to the requirements of the BSA, should, prior to engaging in PPP lending activities, including making PPP loans to either new or existing customers who are eligible borrowers under the PPP, establish an anti-money laundering (AML) compliance program equivalent to that of a comparable federally regulated institution. Depending upon the comparable federally regulated institution, such a program may include a customer identification program (CIP), which includes identifying and verifying their PPP borrowers' identities (including e.g., date of birth, address, and taxpayer identification number), and, if that PPP borrower is a company, following any applicable beneficial ownership information collection requirements. Alternatively, if available, entities may rely on the CIP of a federally insured depository institution or federally insured credit union with an established CIP as part of its AML program. In either instance, entities should also understand the nature and purpose of their PPP customer relationships to develop customer risk profiles. Such entities will also generally have to identify and report certain suspicious activity to the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). If such entities have questions with regard to meeting these requirements, they should contact the FinCEN Regulatory Support Section at FRC@fincen.gov. In addition, FinCEN has created a COVID–19-specific contact channel, via a specific drop-down category, for entities to communicate to FinCEN COVID–19-related concerns while adhering to their BSA obligations. Entities that wish to communicate such COVID–19-related concerns to FinCEN should go to www.FinCEN.gov, click on "Need Assistance," and select "COVID19" in the subject drop-down list.

Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the "Paycheck Protection Application Form." Borrowers must submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099–MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

c. Can lenders rely on borrower documentation for loan forgiveness?

Yes. The lender does not need to conduct any verification if the borrower submits documentation supporting its request for loan forgiveness and attests that it has accurately verified the payments for eligible costs. The Administrator will hold harmless any lender that relies on such borrower documents and attestation from a borrower. The Administrator, in

consultation with the Secretary, has determined that lender reliance on a borrower's required documents and attestation is necessary and appropriate in light of section 1106(h) of the Act, which prohibits the Administrator from taking an enforcement action or imposing penalties if the lender has received a borrower attestation.

d. What fees will lenders be paid?

SBA will pay lenders fees for processing PPP loans in the following amounts:
  i. Five (5) percent for loans of not more than $350,000;
  ii. Three (3) percent for loans of more than $350,000 and less than $2,000,000; and
  iii. One (1) percent for loans of at least $2,000,000.

e. Do lenders have to apply the "credit elsewhere test"?

No. When evaluating an applicant's eligibility lenders will not be required to apply the "credit elsewhere test" (as set forth in section 7(a)(1)(A) of the Small Business Act (15 U.S.C. 636) and SBA regulations at 13 CFR 120.101)).

4. What do both borrowers and lenders need to know and do?

a. What are the loan terms and conditions?

Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to:
  i. The guarantee percentage is 100 percent.
  ii. No collateral will be required.
  iii. No personal guarantees will be required.
  iv. The interest rate will be 100 basis points or one percent.
  v. All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds.

b. Are there any fee waivers?
  i. There will be no up-front guarantee fee payable to SBA by the Borrower;
  ii. There will be no lender's annual service fee ("on-going guaranty fee") payable to SBA;
  iii. There will be no subsidy recoupment fee; and
  iv. There will be no fee payable to SBA for any guarantee sold into the secondary market.

c. Who pays the fee to an agent who assists a borrower?

Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:
  i. One (1) percent for loans of not more than $350,000;
  ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and
  iii. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

d. Can PPP loans be sold into the secondary market?

Yes. A PPP loan may be sold on the secondary market after the loan is fully disbursed. A PPP loan may be sold on the secondary market at a premium or a discount to par value. SBA will issue guidance regarding any advance purchase for loans sold in the secondary market.

e. Can SBA purchase some or all of the loan in advance?

Yes. A lender may request that the SBA purchase the expected forgiveness amount of a PPP loan or pool of PPP loans at the end of week seven of the covered period. The expected forgiveness amount is the amount of loan principal the lender reasonably expects the borrower to expend on payroll costs, covered mortgage interest, covered rent, and covered utility payments during the eight week period after loan disbursement. At least 75 percent of the expected forgiveness amount shall be for payroll costs, as provided in 2.o. To submit a PPP loan or pool of PPP loans for advance purchase, a lender shall submit a report requesting advance purchase with the expected forgiveness amount to the SBA. The report shall include: the Paycheck Protection Program Application Form (SBA Form 2483) and any supporting documentation submitted with such application; the Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty (SBA Form 2484) and any supporting documentation; a detailed narrative explaining the assumptions used in determining the expected forgiveness amount, the basis for those assumptions, alternative assumptions considered, and why alternative assumptions were not used; any information obtained from the borrower since the loan was disbursed that the lender used to determine the expected forgiveness amount, which should include the same documentation required to apply for loan forgiveness such as payroll tax filings, cancelled checks, and other payment documentation; and any additional information the Administrator may require to determine whether the expected forgiveness amount is reasonable. The Administrator, in consultation with the Secretary, determined that seven weeks is the minimum period of time necessary for a lender to reasonably determine the expected forgiveness amount for a PPP loan or pool of PPP loans, since the PPP is a new program and the likelihood that many borrowers will be new clients of the lender. The expected forgiveness amount may not exceed the total amount of principal on the PPP loan or pool of loans. The Administrator will purchase the expected forgiveness amount of the PPP loan(s) within 15 days of the date on which the Administrator receives a complete report that demonstrates that the expected forgiveness amount is indeed reasonable.

5. Additional Information

All loans guaranteed by the SBA pursuant to the CARES Act will be made consistent with constitutional, statutory, and regulatory protections for religious liberty, including the First Amendment to the Constitution, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 and bb–3, and SBA regulation at 13 CFR 113.3–1h, which provides that nothing in SBA nondiscrimination regulations shall apply to a religious corporation, association, educational institution or society with respect to the membership or the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its religious activities. SBA intends to promptly issue additional guidance with regard to religious liberty protections under this program.

SBA may provide further guidance, if needed, through SBA notices and a program guide which will be posted on SBA's website at *www.sba.gov*.

Questions on the Paycheck Protection Program 7(a) Loans may be directed to the Lender Relations Specialist in the local SBA Field Office. The local SBA Field Office may be found at *https://www.sba.gov/tools/local-assistance/districtoffices*.

## Compliance With Executive Orders 12866, 12988, 13132, and 13771, the Paperwork Reduction Act (44 U.S.C. Ch. 35), and the Regulatory Flexibility Act (5 U.S.C. 601–612)

### E.O. 12866 and E.O. 13563

This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563. SBA, however, is proceeding under the emergency provision at Executive Order 12866 Section 6(a)(3)(D) based on the need to move expeditiously to mitigate the current economic conditions arising from the COVID–19 emergency. This rule's designation under Executive Order 13771 will be informed by public comment.

This rule is necessary to implement Sections 1102 and 1106 of the CARES Act in order to provide economic relief to small businesses nationwide adversely impacted under the COVID–19 Emergency Declaration. We anticipate that this rule will result in substantial benefits to small businesses, their employees, and the communities they serve. However, we lack data to estimate the effects of this rule.

### Executive Order 12988

SBA has drafted this rule, to the extent practicable, in accordance with the standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, to minimize litigation, eliminate ambiguity, and reduce burden. The rule has no preemptive or retroactive effect.

### Executive Order 13132

SBA has determined that this rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various layers of government. Therefore, SBA has determined that this rule has no federalism implications warranting preparation of a federalism assessment.

### Paperwork Reduction Act, 44 U.S.C. Chapter 35

SBA has determined that this rule will impose recordkeeping or reporting requirements under the Paperwork Reduction Act ("PRA"). SBA has obtained emergency approval under OMB Control Number 3245–0407 for the information collection (IC) required to implement the program described above. This IC consists of Form 2483 (Paycheck Protection Program Application Form), SBA Form 2484 (Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty), and SBA Form 3506 (CARES Act Section 1102 Lender Agreement), and SBA Form 3507 (CARES Act Section 1102 Lender Agreement—Non-Bank and Non-Insured Depository Institution Lender). The collection is approved for use until September 30, 2020.

### Regulatory Flexibility Act (RFA)

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the APA or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register**. 5 U.S.C. 603, 604. Specifically, the RFA normally requires agencies to describe the impact of a rulemaking on small entities by providing a regulatory impact analysis. Such analysis must address the consideration of regulatory options that would lessen the economic effect of the rule on small entities. The RFA defines a "small entity" as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. 5 U.S.C. 601(3)–(6). Except for such small government jurisdictions, neither State nor local governments are "small entities." Similarly, for purposes of the RFA, individual persons are not small entities.

The requirement to conduct a regulatory impact analysis does not apply if the head of the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. 605(b). The agency must, however, publish the certification in the **Federal Register** at the time of publication of the rule, "along with a statement providing the factual basis for such certification." If the agency head has not waived the requirements for a regulatory flexibility analysis in accordance with the RFA's waiver provision, and no other RFA exception applies, the agency must prepare the regulatory flexibility analysis and publish it in the **Federal Register** at the time of promulgation or, if the rule is promulgated in response to an emergency that makes timely compliance impracticable, within 180 days of publication of the final rule. 5 U.S.C. 604(a), 608(b).

Rules that are exempt from notice and comment are also exempt from the RFA requirements, including conducting a regulatory flexibility analysis, when among other things the agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest. Small Business Administration's Office of Advocacy guide: *How to Comply with the Regulatory Flexibility Ac. Ch.1. p.9*. Accordingly, SBA is not required to conduct a regulatory flexibility analysis.

Authority: 15 U.S.C. 636(a)(36); Coronavirus Aid, Relief, and Economic Security Act, Public Law 116–136, Section 1114.

**Jovita Carranza,**
*Administrator.*
[FR Doc. 2020–07672 Filed 4–10–20; 4:15 pm]
**BILLING CODE P**

---

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 121

[Docket No. SBA–2020–0019]

RIN 3245–AH35

### Business Loan Program Temporary Changes; Paycheck Protection Program

**AGENCY:** U.S. Small Business Administration.
**ACTION:** Interim final rule.

**SUMMARY:** Elsewhere in this issue of the **Federal Register**, the U.S. Small Business Administration (SBA) is publishing an interim final rule (the Initial Rule) announcing the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new program, titled the "Paycheck Protection Program," to the SBA's 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. The Paycheck Protection Program and loan forgiveness are intended to provide economic relief to small businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID–19). This interim final rule supplements the Initial Rule with additional guidance regarding the application of certain affiliate rules applicable to SBA's implementation of sections 1102 and 1106 of the Act and requests public comment.

**DATES:**
*Effective date:* This interim final rule is effective April 15, 2020.

*Applicability date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.